No. 24-5493

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

―――――――――――

IN RE: NATIONAL FOOTBALL LEAGUE'S "SUNDAY TICKET" ANTITRUST
LITIGATION

―――――――――――

NINTH INNING, INC., ET AL.,

*Plaintiffs-Appellants,*

v.

DIRECTV, LLC, ET AL.,

*Defendants-Appellees*

―――――――――――

On Appeal from the United States District Court
for the Central District of California, No. 2:15-ml-02668 (Gutierrez,
D.J.)

―――――――――――

## BRIEF FOR SPORTS ECONOMISTS AS AMICI CURIAE
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

―――――――――――

PATRICK F. MADDEN
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3035 (*telephone*)
*pmadden@bm.net*

MATTHEW SUMMERS
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684 (*telephone*)
*msummers@bm.net*

*Counsel for Amicus Curiae*

January 17, 2025

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ....................................................................i

TABLE OF AUTHORITIES .............................................................ii

INTEREST OF AMICI CURIAE.......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................3

ARGUMENT ...............................................................................7

    I.        THE TRIAL COURT'S DECISION ...............................7

    II.       HOW THE TRIAL COURT ERRED............................9

        A.    Dr. Rascher Used Standard, Reliable Economic Methodologies.....................................................11

        B.    Dr. Rascher Properly Applied These Methodologies Here ...............................................................15

            1.  Dr. Rascher established that the challenged conduct was anticompetitive.........................15

            2.  Dr. Rascher applied reasonable methods to estimate damages.......................................20

            3.  Defendants' attacks lack merit. ...........................24

CONCLUSION .........................................................................30

CERTIFICATE OF COMPLIANCE...............................................32

APPENDIX: LIST OF AMICI CURIAE...........................................33

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................................................14

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .............................................. 12, 24, 29

*In re Broiler Chicken Grower Antitrust Litig. (No. II)*,
2024 WL 2117359 (E.D. Okla. May 8, 2024) ...........................................14

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007) ....................................................12

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996)...................................................13

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
958 F.3d 1239 (9th Cir. 2020) ....................................................14

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005)...................................................12

*In re Zetia (Ezetimibe) Antitrust Litig.*,
587 F. Supp. 3d 356 (E.D. Va. 2022) ...........................................14

*Le v. Zuffa, LLC*,
2023 WL 5085064 (D. Nev. Aug. 9, 2023) ................................12

*Muffett v. City of Yakima*,
2012 WL 12827492 (E.D. Wash. July 20, 2012) .....................................12

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ..................................................................4

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
993 F.3d 774 (9th Cir. 2021) .......................................................12

## OTHER AUTHORITIES

ABA Antitrust Law Section,
*Antitrust Law Developments* 669–673 (3d ed. 1992) ..............................13

ABA Antitrust Law Section, *Proving Antitrust Damages: Legal and Economic Issues* (2d Ed. 2010).....................................................................12

Arthur A. Fleisher III et al., *The National Collegiate Athletic Association: A Study in Cartel Behavior* (1992) ...................................5, 17

David Greenspan, *College Football's Biggest Fumble: The Economic Impact of the Supreme Court's Decision in National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,*
ANTITRUST BULL. 33(1) (1988) ........................................................................5

David Scheffman & Mary Coleman, *Quantitative Analysis of Potential Competitive Effects from a Merger,*
12 GEO. MASON L. REV. 319 (2003)................................................................13

David Scheffman et al., *Twenty Years of Merger Guidelines Enforcement at the FTC: An Economic Perspective,*
71 ANTITRUST L.J. 277 (2003)........................................................................13

Denis Carlton, *Using Economics to Improve Antitrust Policy,*
2004 COLUM. BUS. L. REV. 283 (2004) ..........................................................13

Fed. Trade Comm'n & U.S. Dep't of Just., *Commentary on the Horizontal Merger Guidelines* (2006).........................................................13

Gunnar Niels et al., *Economics for Competition Lawyers* (2011)............26

John J. Siegfried & Molly Gardner Burba, *The College Football Association Television Broadcast Cartel,*
ANTITRUST BULL. 49 (3) (2004)........................................................................5

John L. Fizel & Randall W. Bennett, *Telecasts and Recruiting in NCAA Division I Football: The impact of altered property rights,*
J. SPORT MGMT. 10 (4) (1996) ..........................................................................5

Kathleen Carroll & Brad R. Humphreys, *Opportunistic Behavior in a Cartel Setting: Effects of the 1984 Supreme Court Decision on College Football Television Broadcasts,*
J. SPORTS ECON. 17 (6) (2016)..........................................................................5

L. Marlene Mawson & William T. Bowler, *Effects of the 1984 Supreme Court Ruling on the Television Revenues of NCAA Division I Football Programs*, J. Sport Mgmt. 3 (2) (1989) ...............................................................5

Malcolm B. Coate & Jeffrey H. Fischer, *Daubert, Science, and Modern Game Theory: Implications for Merger Analysis*, 20 Sup. Ct. Econ. Rev. 125 (2012)............................................................13

Rodney Fort & James Quirk, *The College Football Industry*, in *Sports Economics: Current Research* (John L Fizel et al. eds., 1999) ...................................................................................................17

Roger D. Blair & David L. Kasserman. *Antitrust Economics* (2nd ed. 2009)...............................................................................................10

Thad Dunning, *Improving Causal Inference: Strengths and Limitations of Natural Experiments*, 61 Pol. Res. Q. 282 (2008) ......................................................................13

Theon van Dijk & Frank Verboven, *Quantification of Damages in III ABA Section of Antitrust Law*, Issues Competition L. & Pol'y 2331 (2008) ............................................12

**Treatises**

IIA Phillip E. Areeda et al., *Antitrust Law* (3d ed. 2007)............................12

William B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. 2022) ..................................................................................12

## INTEREST OF AMICI CURIAE

Amici are academic economists who have published significant research on the economics of major league team sports and college athletics. The authors have written this brief independently without payment for its preparation.[1]

As professional economists and citizens, amici feel obliged to further the correct use of economics pertaining to antitrust actions. Amici are experts in economics, not law, but our work and research in antitrust economics are often at the intersection of the two disciplines. Amici respond to the economic substance of the trial court's analysis in its opinion and offer no assessment on the law.

Amici include:

*Nola Agha, University of San Francisco*
*Robert Baade, Lake Forrest College (Emeritus)*
*David Berri, Southern Utah University*
*Craig Depkin, University of North Carolina, Charlotte*
*Rodney Fort, University of Michigan*
*Jill Harris, Air Force Academy*
*Anthony Krautmann, DePaul University*
*Michael Leeds, Temple University*
*Joel Maxcy, Drexel University*
*Raymond Sauer, Clemson University, Emeritus*
*John J. Siegfried, Vanderbilt University*

---

[1] Pursuant to Fed. R. App. P. 29(a)(4), the undersigned certifies that no party's counsel authored this brief in whole or in part, and no party or party's counsel, or other person besides amici and their counsel contributed money to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

1

*Hal J. Singer, University of Utah*
*John Solow, University of Central Florida*
*Stefan Szymanski, University of Michigan*
*Jason Winfree, University of Idaho*
*Andrew Zimbalist, Smith College*

## INTRODUCTION AND SUMMARY OF ARGUMENT

After trial in this matter, the trial court held that all testimony of expert witness economist Dr. Daniel Rascher was "not based on a reliable methodology" and excluded it.[2] The trial court then granted Defendants-Appellees' motion for judgment as a matter of law and vacated the jury's damages verdict.[3]

In this brief, amici, as economists, argue that Dr. Rascher applied standard, reliable economic principles and methods in analyzing Defendants-Appellees' centralized negotiation of broadcast rights at the league level to create the NFL Sunday Ticket ("Sunday Ticket") and provide it exclusively through DirecTV (the "challenged conduct"). Dr. Rascher used these economic principles and methods in (1) concluding that Defendants-Appellees' challenged conduct was anticompetitive (restricting output[4] and increasing prices for out-of-market NFL games), and (2) estimating the amount of damages (how much the class of Sunday Ticket purchasers were overcharged because of the challenged conduct).

First, Dr. Rascher applied reliable economic principles in concluding that the challenged conduct was anticompetitive. Sound economic analysis predicts that the challenged conduct limits the

---

[2] 1-ER-6.

[3] 1-ER-24.

[4] "Output" here means more television viewership and choice. 7-ER-1187. ("[T]he harm to competition is in sort of the – as economists, we tend to say reduction of output being measured by viewership and choice and – and the ability for a household to be able to choose those games.").

3

availability and thus restricts viewership of out-of-market NFL games. Limited availability and restricted viewership constitute reduced output and are hallmark anticompetitive effects. Economic theory predicts restricted output will result in higher prices for purchasers. Dr. Rascher confirmed the applicability of these sound economic principles through standard economic methodologies, *e.g.*, comparing viewership and prices of Sunday Ticket in the United States to appropriate analogues (yardsticks and a natural experiment).

Principally, Dr. Rascher analyzed similarities and differences between the market dynamics for NFL and college football telecasts for economic relevance. He concluded that college football represented an appropriate yardstick for analyzing the challenged conduct based on the myriad similarities between the two broadcast products, including that they involve the same sport in the same season, both typically on weekend days, similar levels of popularity, and even involve the same purchasers of media rights (*e.g.*, over-the-air and standard cable/satellite stations such as FOX, CBS, and ABC/ESPN). Dr. Rascher looked to a "before and after" natural experiment occurring in the college football yardstick market stemming from the Supreme Court's decision in *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), in which the Court prohibited the NCAA from collectively selling college

4

football telecast rights.[5] The result was that individual teams and conferences began to sell those rights independently, and college football games became substantially more available on free, over-the-air and standard cable/satellite stations. *Id.* Today, many more college football games than NFL games are available to viewers through these mediums. Dr. Rascher also used college football as a yardstick to analyze how pooling television rights affects output and price for football telecasts. He concluded, with reference to the college football yardstick, that the challenged conduct in the NFL suppressed output and increased prices for out-of-market NFL games, making the challenged conduct anticompetitive in nature.

---

[5] Economists have long analyzed the effects of pooled television rights in sports, evaluating the changes stemming from *Board of Regents* on the availability of college football telecasts as part of such analyses. *See, e.g.*, Kathleen Carroll & Brad R. Humphreys, *Opportunistic Behavior in a Cartel Setting: Effects of the 1984 Supreme Court Decision on College Football Television Broadcasts*, J. SPORTS ECON. 17 (6), 601–28 (2016); John J. Siegfried & Molly Gardner Burba, *The College Football Association Television Broadcast Cartel*, ANTITRUST BULL. 49 (3), 799–819 (2004); John L. Fizel & Randall W. Bennett, *Telecasts and Recruiting in NCAA Division I Football: The impact of altered property rights*, J. SPORT MGMT. 10 (4), 359–72 (1996); Arthur A. Fleisher III et al., *The National Collegiate Athletic Association: A Study in Cartel Behavior*, 23, 51–56, 58–60, 77–78, 147 (1992); L. Marlene Mawson & William T. Bowler, *Effects of the 1984 Supreme Court Ruling on the Television Revenues of NCAA Division I Football Programs*, J. SPORT MGMT. 3 (2) (1989); David Greenspan, *College Football's Biggest Fumble: The Economic Impact of the Supreme Court's Decision in National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, ANTITRUST BULL. 33(1), 1–65 (1988).

Second, Dr. Rascher employed reliable economic reasoning and methodologies to estimate damages. He looked to college football telecasts in the present as a yardstick for what NFL telecasts would look like in a world not tainted by the challenged conduct. He found that, based on the widespread availability of college football games via free, over-the-air and standard cable/satellite channels, sufficient free, over-the-air and standard cable/satellite channels are available to host all NFL games. He also found that there is equal if not greater demand for all NFL games than college broadcasts. These and other findings yielded the reasonable conclusion that, in the "but-for world" without the challenged conduct, all out-of-market NFL games would be available via free, over-the-air or standard cable/satellite channels. Dr. Rascher used the standard yardstick method to estimate damages as the difference between the prices paid by Sunday Ticket purchasers and what they would have paid in the but-for world.

Contrary to the trial court's opinion, Dr. Rascher's testimony is well-grounded in reliable and well-accepted economic principles and methods. On that basis, we ask this Court to readmit the testimony of Dr. Rascher.[6]

---

[6] Amici do not assess the testimony of Dr. John Zona herein without access to the underlying data and specifics of his econometric analyses.

## ARGUMENT

## I.    THE TRIAL COURT'S DECISION

The trial court's opinion erringly excluded Dr. Rascher's testimony in full based on the trial court's view that Dr. Rascher's estimation of damages was mere *ipse dixit* and not grounded in reliable economics.[7] Dr. Rascher analyzed whether college football was sufficiently similar to the NFL to inform what would have occurred if NFL teams could not sell their out-of-market media rights collectively. *Id.* Dr. Rascher opined that, just like in college football where similar conduct has long been prohibited, NFL games would have been available via over-the-air channels and on standard cable/satellite channels. *Id.* As a result, he reasoned that (1) NFL fans would not have paid anything extra above what they were paying for cable or satellite and (2) out-of-market NFL games would be available to a far larger number of households, increasing viewership (*i.e.*, output). *Id.*

The trial court noted:

> In Dr. Rascher's "but-for-world" where individual teams had the ability to license their out-of-market games for paid television, those games could have been made available on regular cable or satellite channels—and class members would not have had to pay the subscription fee required for the Sunday Ticket product. . . . [Dr. Rascher] looked to see if it was feasible . . . to do what was happening in college football in the NFL by preparing schedules showing games that actually existed with the NFL schedule on alternative channels where they could have been shown . . .

---

[7] 1-ER-13–17.

As the NFL out-of-market games would have been available for free on top of a cable subscription, Dr. Rascher calculated the damages for the 11-year class period by adding all the total payments for Sunday Ticket—roughly $5.6 billion for the residential customers and $1.3 billion from the commercial customers. As these customers would have paid zero. Defendants have requested a post-trial *Daubert* review of Dr. Rascher's testimony based on his college football but-for world. Defendants argued that Dr. Rascher's college football but-for world "is not the product of reliable economic methodology" as it is devoid of economic reasoning and contrary both to basic economics principle and *all* of the trial testimony offered by witnesses other than Dr. Rascher. As such, they maintain that Dr. Rascher's testimony must be excluded," *id.* 3:27, because his "ill-defined college football BFW raises many questions that should have been answered as a matter of sound economic analysis, but that he completely failed to answer other than with his unsupported and sharply contradicted say-so.[8]

The trial court agreed with the Defendant's argument, finding the college football but-for world evaluation to be economically unreliable:

[T]he Court finds that [Dr. Rascher's] college but-for world was not based on a reliable methodology but rather *ipse dixit* opinion untethered to an economic analysis of what would have likely occurred in the but-for world and must be excluded. . . Plaintiffs' arguments that the law only requires presenting a world without the challenged restraints, that the Ninth Circuit blessed Dr. Rascher's "yardstick" of college football, and that Dr. Rascher's findings were corroborated by the NFL's 2017 "New Frontier" presentation are unpersuasive. . . .

. . . [T]he Ninth Circuit recognized that after [the] Supreme Court "struck down the NCAA's restrictive telecast agreements as violating the Sherman Act" in *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, there was increased competition in college football telecasts as the number of televised football games grew exponentially. The Ninth Circuit certainly did not

---

[8] 1-ER-13 (quotations and citations omitted).

indicate that because college football was a helpful analog at the pleading stage [in this case], Dr. Rascher could offer any opinion for a but-for world between 2011 and 2023 by invoking the proliferation of college football [] games after 1984.

Lastly, Dr. Rascher cannot rely on the NFL's 2017 "New Frontier" as evidence of what could have happened in his college but-for world because the document does not contemplate his fundamental premise of the NFL Teams owning and negotiating media rights for the out-of-market Sunday afternoon games—games sold on Sunday Ticket. . . The NFL's 2017 New Frontier envisioned replicating Sunday Ticket on basic cable, which involved the NFL Teams continuing to pool their rights with the NFL.

Because Dr. Rascher's testimony relied on a college football model that was developed based on speculation and ipse dixit opinion, the trial court excludes Dr. Rascher's testimony under FRE 702.[9]

## II. HOW THE TRIAL COURT ERRED

In our view, Dr. Rascher's written and courtroom testimony is consistent with standard and reliable economic theory and methodology. This is true of both his findings that the challenged conduct was anticompetitive and in his approach to estimating damages.

Plaintiffs-Appellants alleged that the individual owners of the professional football franchises comprising the NFL pooled their rights as a league and sold them to a single, exclusive distributor for the purpose of creating and upholding monopoly power. This gave them monopoly power over the broadcast of out-of-market professional football games. As a result, individual teams or smaller groups of teams did not exercise these rights individually and/or across multiple distributors.

---

[9] 1-ER-16–17 (emphasis added, citations omitted).

Antitrust economists focus on the impacts of market power on price, output, and quality. Standard economic principles suggest that pooled negotiations of rivals with market power is expected to yield higher prices and reduced output compared to negotiations by individuals or groups without market power.[10] Similarly, standard economic principles suggest that selling out-of-market broadcast rights through a single distributor rather than multiple distributors will decrease output and raise price. *See*, *e.g.*, *id.*

Dr. Rascher used standard economic methods to apply this economic theory and determine whether NFL's pooled negotiations through a single distributor (DirecTV) reduced output and raised prices or increased output and lowered prices. He looked at two comparable situations to tease out the effects of the two prongs of the challenged conduct. First, Dr. Rascher sought to analyze the effects of the challenged conduct's use of a single distributor (exclusivity). To do so, he looked at how the NFL itself sells out-of-market rights in Canada, where the NFL sells through multiple distributors (including a streaming option that required no other cable or satellite subscription).[11] Dr. Rascher observed that Sunday Ticket was sold at lower prices in Canada as compared to

---

[10] *E.g.*, Roger D. Blair & David L. Kasserman. *Antitrust Economics* 4 ¶5 (2nd ed. 2009) ("…a firm (or group of firms acting in concert) gains a significant amount of control over the market price…Instead price will be raised above the competitive level…the monopolist restricts output in order to sustain the higher price…").

[11] 7-ER-1169–1172.

the United States, where a single distributor makes it available at a higher price. *Id.* Second, to analyze the effects of the NFL's pooled negotiations, Dr. Rascher looked to a natural experiment and yardstick: He examined the evolution of college football broadcasts following the Supreme Court's prohibition of the NCAA from pooling its negotiations of broadcast rights in *Board of Regents*,[12] and then used the availability of college football telecasts in the present as a yardstick to estimate damages to the Class.[13]

The trial court's finding that Dr. Rascher's opinions relied on "ipse dixit" "untethered to an economic analysis of what would have likely occurred in the but-for world" was in error.[14] Each of Dr. Rascher's methods employed standard, reliable economic theory and methodology, and the resulting opinions are grounded in what economic theory predicts. Dr. Rascher's testimony was improvidently excluded.

## A. Dr. Rascher Used Standard, Reliable Economic Methodologies

Dr. Rascher's testimony in this case used standard and reliable economic methodologies regularly used by economists in academia and litigation to determine that the challenged conduct was anticompetitive

---

[12] *See, e.g.*, 7-ER-1145–1156.

[13] 7-ER-1177–1181.

[14] *See* 1-ER-16–17.

and to estimate damages. The principal methodologies he used were yardstick analysis and a natural experiment.

Under a yardstick approach, an economist will compare the industry at issue to a comparable industry not affected by the anticompetitive conduct.[15] All that is required for the yardstick to be proper is for it and the industry in question to have some "meaningful economic similarity."[16] The yardstick approach is "considered . . . well-established and reliable" in antitrust economics.[17] Myriad courts have approved the use of the yardstick approach in antitrust cases.[18]

---

[15] *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) (citations omitted).

[16] *Id.* at 1222.

[17] IIA Phillip E. Areeda et al., *Antitrust Law*, ¶399b, p.445 (3d ed. 2007); *see also* William B. Rubenstein, *Newberg and Rubenstein on Class Actions*, §20:61 (6th ed. 2022) (noting the "yardstick method" is one of the "most common methodologies employed in calculating antitrust damages" and that "horizontal conspiracies" like the one alleged here "are especially suited" to such method); ABA Antitrust Law Section, *Proving Antitrust Damages: Legal and Economic Issues*, 174, 206-07 (2d Ed. 2010) (citing Theon van Dijk & Frank Verboven, *Quantification of Damages in III ABA Section of Antitrust Law*, ISSUES COMPETITION L. & POL'Y 2331, 2336 (2008)) (discussing yardstick approach to calculating damages).

[18] *See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788 (9th Cir. 2021), *on reh'g en banc,* 31 F.4th 651 (9th Cir. 2022); *Le v. Zuffa, LLC*, 2023 WL 5085064 at *35 (D. Nev. Aug. 9, 2023) (denying motion to exclude testimony of economists using yardsticks to calculate damages); *Muffett v. City of Yakima*, 2012 WL 12827492, at *2 (E.D. Wash. July 20, 2012); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145 (C.D. Cal. 2007) (collecting cases); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) (approving class certification where expert had shown classwide common proof of damages using *inter alia* a yardstick analysis); *see also In re NASDAQ Market-Makers*

When analyzing a natural experiment, an economist will look at circumstances occurring outside the control of the economist in which the economist can observe the effects of changes in a test variable while controlling (directly or indirectly) for other considerations.[19] As with yardsticks, the use of natural experiments to analyze and confirm proper application of economic theory is standard in the field of antitrust economics.[20] For example, in the *Commentary on the Horizontal Merger Guidelines*, the Federal Trade Commission and the United States Department of Justice explicitly describe natural experiments as "[e]vidence pointing directly toward competitive effects."[21] As with

---

*Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996) (describing different damages methodologies, including the yardstick approach as alternative options to plaintiffs in antitrust litigation) (citing ABA Antitrust Law Section, *Antitrust Law Developments* 669–673 (3d ed. 1992) and cases cited therein).

[19] *See, e.g.*, Malcolm B. Coate & Jeffrey H. Fischer, *Daubert, Science, and Modern Game Theory: Implications for Merger Analysis*, 20 SUP. CT. ECON. REV. 125, 151 n.113 (2012).

[20] *See, e.g.*, David Scheffman et al., *Twenty Years of Merger Guidelines Enforcement at the FTC: An Economic Perspective*, 71 ANTITRUST L.J. 277 (2003); David Scheffman & Mary Coleman, *Quantitative Analysis of Potential Competitive Effects from a Merger*, 12 GEO. MASON L. REV. 319 (2003); Denis Carlton, *Using Economics to Improve Antitrust Policy*, 2004 COLUM. BUS. L. REV. 283 (2004); s*ee also* Thad Dunning, *Improving Causal Inference: Strengths and Limitations of Natural Experiments*, 61 POL. RES. Q. 282 (2008) (providing an overview of the natural experiment methodology).

[21] Fed. Trade Comm'n & U.S. Dep't of Just., *Commentary on the Horizontal Merger Guidelines* (2006), *available at* https://www.ftc.gov/sites/default/files/attachments/merger-review/commentaryonthehorizontalmergerguidelinesmarch2006.pdf (last visited Jan. 17, 2024).

yardsticks, courts commonly uphold economists' use of natural experiments.[22] Indeed, the trial court in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation* relied on (and this Court affirmed) Dr. Rascher's application of natural experiments.[23] In that case, the plaintiffs challenged the NCAA's rules restricting the amount of compensation schools could pay to student athletes. Defendants claimed the restriction was critical to consumer demand for college athletics.[24] To evaluate that claim, Dr. Rascher analyzed a natural experiment, comparing the consumer demand before and after specific changes in student athlete compensation and found "no negative impact on consumer demand."[25]

In short, the methodologies selected by Dr. Rascher are standard and reliable approaches routinely performed by experts and accepted by courts in antitrust litigation.

---

[22] *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 970 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 681 (2024), and *cert. denied,* 144 S. Ct. 682 (2024); *In re Broiler Chicken Grower Antitrust Litig. (No. II)*, 2024 WL 2117359 at *18 (E.D. Okla. May 8, 2024) (denying motion to exclude expert testimony that established nationwide liability and damages using a natural experiment measuring the change in compensation to chicken farmers from a limited geographic area when the alleged conspiracy broke down in that location); *In re Zetia (Ezetimibe) Antitrust Litig.*, 587 F. Supp. 3d 356, 362–63 (E.D. Va. 2022) (accepting testimony of expert analyzing natural experiments to establish lack of cross-price elasticity between brand and generic drugs).

[23] 958 F.3d 1239, 1250, 1258, 1262 (9th Cir. 2020).

[24] *Id.* at 1250.

[25] *Id.* (citations omitted).

14

## B.    Dr. Rascher Properly Applied These Methodologies Here

Dr. Rascher applied these yardstick and natural experiment analyses for two purposes: to establish the NFL's challenged conduct was anticompetitive (reducing output and increasing price) and to estimate damages. We address each application in turn.

### 1.    Dr. Rascher established that the challenged conduct was anticompetitive.

To ascertain whether the challenged conduct was anticompetitive, Dr. Rascher analyzed two yardsticks: NFL's Sunday Ticket sales in Canada and college football broadcasts for the top-ranked teams.[26] For the NFL's Canadian Sunday Ticket sales, Dr. Rascher determined that there were multiple Canadian distributors (both cable and satellite) and a standalone streaming option.[27] In the United States, by contrast, Dr. Rascher found that the NFL used an exclusive distributorship arrangement with DirecTV that did not permit cable distribution or a standalone streaming service.[28] Dr. Rascher then looked to other major sports leagues in the United States to examine the feasibility of offering out-of-market NFL games through multiple distributors (cable and satellite) and/or via standalone streaming services. He observed: (1) the National Hockey League offered its out-of-market package via ESPN's

---

[26] 7-ER-11445–1156, -1169–1172, -1240, -1278–1279.

[27] 7-ER-1170.

[28] *Id.*

15

streaming services; and (2) Major League Baseball offered its out-of-market package through multiple television distributors and a direct streaming package.[29] Based on these observations of other sports and the NFL in Canada, Dr. Rascher concluded that there was no impediment to the NFL selling Sunday Ticket through multiple distributors in the United States.

Dr. Rascher then analyzed the differences in price and output between the NFL's United States Sunday Ticket offerings and yardstick offerings that use multiple distributors. He concluded that the yardstick packages were all substantially less expensive than the exclusive Sunday Ticket offering in the United States.[30]

Dr. Rascher also analyzed the natural experiment of the change in college football telecasts after the Supreme Court's *Board of Regents* decision to determine whether Sunday Ticket suppressed output and increased prices. Dr. Rascher observed the change in availability of college football game telecasts after the Supreme Court banned the NCAA from engaging in similar conduct to the NFL's challenged conduct here. He found that *Board of Regents* created a substantially more competitive college football broadcast rights environment. The direct result of the decision was a tremendous increase in the number of televised games after NCAA Football Bowl Subdivision schools began

---

[29] 7-ER-1170–1173.

[30] 7-ER-1150–1150, -1170–1173, -1177–1182.

competing among each other to sell their television rights.[31] This massively expanded industry output beyond previous limits of one or two games per weekend on one network.[32] With the individual schools and conferences negotiating television rights, college football games quickly became available across numerous over-the-air networks and standard cable/satellite channels. *Id.*[33]

Dr. Rascher observed these massive expansions of output due to the broad availability of college football televised games across numerous channels following the *Board of Regents* ruling. He analyzed whether the NFL was similar enough to college football that a similar expansion would be expected. Dr. Rascher concluded that the NFL and college football were sufficiently similar based on myriad factors and considerations.[34] Dr. Rascher then analyzed how similar changes observed in the college football natural experiment would manifest in the NFL if pooled negotiations were banned in the NFL for out-of-market

---

[31] This finding accords with those of other economists outside of the litigation context, *e.g.*, Fleisher, *supra* n.5, at 51–56, 147 (discussing *Board of Regents* and the present competitiveness of market for college football telecasts).

[32] 7-ER-1145–1148.

[33] Dr. Rascher's observations accord with those of other economists performing similar work. *See, e.g.*, Rodney Fort & James Quirk, *The College Football Industry*, in *Sports Economics: Current Research* 11–26 (John L Fizel et al. eds., 1999).

[34] *See, e.g.*, 7-ER-1145–1146 (discussing analysis of NCAA's holding and selling of similar media rights pre-1984 to what the NFL holds and sells during the relevant time period; and comparing the production function, demand for the football products, seasonality, and days of the week).

broadcasts. He found significant similarities and no economically relevant differences. Given his opinion that college football is an appropriate yardstick, Dr. Rascher concluded that the dramatic expansion of output in college football during the natural experiment is a strong indication of the challenged conduct's anticompetitive effects.

Dr. Rascher also reviewed evidence in the record, which confirmed his findings. Dr. Rascher concluded that other broadcasters and streaming services were viable options in the United States. For example, he credited evidence from ESPN that it sought to offer Sunday Ticket at a much lower price (and evidence that ESPN carries the National Hockey League out-of-market package on its streaming service).[35] Dr. Rascher further considered evidence that the NFL and its broadcast partners (CBS and FOX) intentionally set out to suppress out-of-market viewership.[36] He points to evidence that CBS preferred Sunday Ticket to have limited subscribership and that FOX did not even want Sunday Ticket to exist.[37] Unsurprisingly, therefore, the NFL set the price of Sunday Ticket in the United States to deliberately reduce the amount of Sunday Ticket purchases to protect FOX and CBS.[38] Such

---

[35] 7-ER-1165, -1171–1172.

[36] 7-ER-31–1132.

[37] *Id.*

[38] *Id.*

supracompetitive pricing would not be possible absent the challenged conduct.

Dr. Rascher also conducted further standard confirmatory economic analyses to evaluate whether an increase in the number of NFL games available via free, over-the-air and/or standard cable/satellite networks would lead to increased output (viewership). Specifically, he analyzed an additional natural experiment in which, on some Sunday afternoons, there are two NFL games (instead of one) in a time slot available to households without Sunday Ticket.[39] A single additional game increased total viewership across both games by 25% to 29%.[40] Dr. Rascher testified that this result was unsurprising. "If you add a different game, you're going to get some people coming over from that one game to watch, but then you're also going to get people who weren't going to watch . . . that first game, they decide they want to watch a second game because it's teams maybe that they care about."[41] This analysis further confirmed that if more NFL games were available to more households, the increased viewership predicted by economic theory would come to fruition.

Dr. Rascher's standard yardstick and natural experiment methodologies, confirmatory analyses, and his review of record evidence validated economic theory's prediction that the challenged conduct

---

[39] 7-ER-1173–1174.

[40] *Id.*

[41] *Id.*

caused suppressed output and increased prices. Dr. Rascher thus used reliable economic methods to opine that the challenged conduct was anticompetitive.

### 2. Dr. Rascher applied reasonable methods to estimate damages.

Dr. Rascher focused on the college football yardstick for his damages estimate. Dr. Rascher analyzed whether the availability of college football games on free, over-the-air and standard cable/satellite stations represented a potential "but-for world", *i.e.*, a world in which the NFL did not engage in the challenged conduct. He concluded that NFL broadcast dynamics would likely look like college football broadcasts if the NFL had not colluded to sell out-of-market television rights to a single distributor.

Dr. Rascher considered significant similarities and potential differences between college football and the NFL.[42] For each potential economically significant similarity or difference, Dr. Rascher would draw information from the record in this case and/or his knowledge and/or research of how other sports leagues and events have addressed the issue. For example, Dr. Rascher found many parallels between college football and NFL games, including the nature of the games (both are football), the "demand factor" that drives people to watch games, the time of year the seasons transpire and the number of games (both fall to winter

---

[42] *See, e.g.*, 7-ER-1145–1146.

with relatively few games compared to other sports), and the days of the week the games are played (weekend days).[43] Dr. Rascher also considered whether any potential differences between college football and the NFL were economically significant, such as issues relating to (1) the number of teams relative to the number of games available in each league; (2) the organization of teams into conferences or divisions for purposes of negotiating media rights, and (3) the practicality of the NFL adopting college football's television production model.[44] Overall, Dr. Rascher found many key similarities between the NFL and the relevant group of college football teams, and no economically significant differences.

Dr. Rascher's analysis focused on the top-ranked college football teams, not all Division I football teams, because these top teams were more comparable to the NFL's 32-team structure and popularity.[45] He found that when top-ranked college teams play each other, in particular, the games are available over the air more than NFL teams' games.[46] Further, because the number of games involving those top-ranked college programs exceeds the number of games the NFL broadcasts in its Sunday afternoon timeslots, Dr. Rascher observed that it would be even easier to assure all or substantially all out-of-market NFL games could be

---

[43] *Id.*

[44] 7-ER-1240–1241, -1253–1260, 1289–1298.

[45] *E.g.*, 7-ER-1148–1158, -1208–1211, -1240–1242, 1278–1279.

[46] 7-ER-1240–1242, -1278–1279.

broadcast on free, over-the-air or standard cable/satellite stations.[47] Dr. Rascher's study of the relative demand for college football and NFL teams found that even the least popular NFL teams are more popular than many of the most popular and highest-ranked college football teams.[48] As a result, it was reasonable for him to conclude that NFL teams would likely receive at least as favorable broadcast distribution as the top college programs.

Dr. Rascher also analyzed whether it made any difference if NFL teams organized themselves in the form of the existing divisions (versus re-organizing themselves to maximize their broadcast rights sales). He concluded that it did not make any difference in terms of whether and how many NFL games would be televised free, over-the-air or on standard cable and satellite channels.[49]

Dr. Rascher also testified about whether dynamics in college football and other sports could help resolve potential concerns with his proposed NFL but-for world. He considered whether it would create an

---

[47] *Id.* However, Dr. Rascher recognized that because college football conferences negotiate television contracts without specifying differential treatment for games involving top-ranked teams, non-top-ranked teams receive widespread broadcasts of games at times. Therefore, the college football television rights market would operate somewhat differently from the NFL. *See* 7-ER-1240–1244.

[48] *E.g.*, 7-ER-1297–1299; *see also* 7-ER-1258–1263, -1269–1270 (explaining even the Jacksonville Jaguars, who have minimal out-of-market fan base, would be expected to have valuable out-of-market television rights).

[49] *E.g.*, 7-ER-1254–1258.

impediment if, say, a team in the NFL with one out-of-market contract played a team in the NFL with another out-of-market contract. He noted that teams in different college football conferences under different media rights deals regularly play each other without issue.[50]

Dr. Rascher also addressed the potential issue of an in-market broadcast by FOX or CBS and an out-of-market broadcast by another provider. He observed that media outlets across sports share television feeds:[51] NBA teams share feeds for different markets' broadcasts, the Olympics shares a feed across broadcast partners, and (in certain circumstances) even different broadcasters will share a feed to the same NFL game.[52] He also opined that FOX and CBS (or ABC or NBC) could likely arrange their bids for both in-market and out-of-market broadcast of blocks of NFL games such that no feed-sharing was required.[53] Instead, each of these over-the-air stations could broadcast the out-of-market games on their cable affiliates (*e.g.*, FOX's FS1 and FX stations). As a result, Dr. Rascher found that these potential issues likewise made no difference economically.

Dr. Rascher then proceeded to testify to his damages estimates. His analysis had found that college football represented an appropriate

---

[50] 7-ER-1272–1273.

[51] 7-ER-1289–1296.

[52] *Id.*

[53] 7-ER-1152–1158.

yardstick for what the market rate would be if the NFL had been prohibited from selling television rights for out-of-market game broadcasts as a single collective to an exclusive distributor. Based on that, Dr. Rascher estimated damages to Sunday Ticket purchasers by calculating the difference between the Sunday Ticket purchase price and the free over-the-air or standard cable/satellite stations on which these games would have likely been broadcast in the but-for world.[54] Such calculation is a standard method for estimating damages that economists regularly perform, particularly given the other analyses Dr. Rascher performed.[55]

### 3. Defendants' attacks lack merit.

Defendants-Appellees have argued that Dr. Rascher's use of college football as a yardstick for the "but-for-world" is not the product of reliable economic analysis. Specifically, it "is devoid of economic reasoning and contrary both to basic economics principle and *all* of the trial testimony

---

[54] We understand that Dr. Rascher performed certain further standard, reliable economic analyses related to this calculation that were not covered in his trial testimony but were disclosed in his written reports. Defendants-Appellees did not raise any deficiencies in these subsidiary analyses at trial nor did they argue that their omission from trial testimony was a defect.

[55] Under a yardstick approach, the amount of damages is "the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities." *Image Tech.*, 125 F.3d at 1221 (quotation and citation omitted).

offered by witnesses other than Dr. Rascher."[56] The trial court agreed that Dr. Rascher's college football example was not the product of sound economic methodology.[57] According to the trial court, Dr. Rascher did not explain how out-of-market telecasts of NFL games would have been available at no additional cost to cable and satellite customers in the "but-for-world."[58] The trial court took particular issue with Dr. Rascher's conclusions that the but-for-world could take various forms based on how teams would "figure [] out" how to resolve various impediments that could arise in these but-for-worlds, ruling that such conclusions were not a "reliable methodology" nor do they "substitute for a model of a but-for world grounded in economic analysis."[59] As a result, the trial court excluded Dr. Rascher's testimony after the jury's verdict.[60] Defendants-Appellees were wrong and the trial court's adoption of their argument was in error. Dr. Rascher's testimony indeed is grounded in sound economic theory and methods.

Dr. Rascher's approach to analyzing the case was based on the use of mutually confirming yardsticks and natural experiments, a standard practice in antitrust economics. Generally in economics, estimation of a

---

[56] 1-ER-13 (emphasis original).

[57] 1-ER-3–17.

[58] 1-ER-14.

[59] 1-ER-14–17.

[60] 1-ER-24

but-for-world price is done by analysis of a comparable market in which the supposed transgression was not present. Economists often employ these yardstick approaches (which could also be called an analysis of comparables for those familiar with real estate appraisals).[61] The use of yardsticks and natural experiments are commonplace economic analyses in the estimation of antitrust damages.[62]

Dr. Rascher testified as to these analyses at length on June 11 and into June 12, 2024. Dr. Rascher acknowledged that the comparisons are not perfect, but he thoroughly analyzed the potential differences and similarities to determine whether they were economically significant as detailed in his trial testimony and expert reports. Dr. Rascher's conclusions that the potential impediments to the but-for world he modeled using his yardstick were economically insignificant was the product of standard economic reasoning. Indeed, as Professor Einer Elhauge (one of Plaintiffs-Appellants' other experts whose testimony the trial court did not exclude) testified, a fundamental principle of economics is that "whenever there is an option that will increase total profits for some set of entities, they will always have incentives to overcome it" and thus "they can always figure out distributional issues."[63] Consistent with

---

[61] Gunnar Niels et al., *Economics for Competition Lawyers* 524 (2011).

[62] *See supra* nn.17, 18.

[63] 13-ER-2527–2528 (discussing economic principle known as the "Coase Theorem.").

26

that principle, Dr. Rascher testified that due to the popularity and corresponding value of NFL out-of-market games (which he measured and analyzed pursuant to standard economic methodologies), teams would have significant incentives to overcome all of the problems Defendants-Appellees' raised.[64] And he further analyzed other sports' approaches to overcoming these same issues, noting that the other sports always managed to overcome them, thus evidencing the likelihood, that NFL teams would overcome them given the significant financial incentives to do so.[65] Based on these analyses, Dr. Rascher concluded that college football was an appropriate yardstick.

We disagree with the trial court that Dr. Rascher's analyses was *ipse dixit* or devoid of economic reasoning and methodology. Using *Board of Regents* as a model for comparison is consistent with standard economic practice, as is the use of present-day college football telecasts as a yardstick against which to evaluate the but-for price of out-of-market NFL games. Perfect parallels to the challenged conduct presented in this case do not exist because the situation is unique to the NFL. However, college football, including the aftermath of *Board of Regents*, provides a strong real-world analogue. The *Board of Regents* natural experiment is widely covered in the sport economics and industrial organization literature as a classic example of the positive results of breaking up a

---

[64] *E.g.*, 7-ER-1297–1299; *see also* 7-ER-1258–1263, -1269–1270.

[65] 7-ER-1289–1296.

monopoly.[66] It is persuasively used to teach undergraduate students of the effects of disrupting a monopoly in sports, such as in *Economics of Sports by* Leeds et al. and *Sports Economics* by Fort.

Using present-day college football telecasts to model damages after identifying critical similarities and the absence of economically relevant distinctions between college football and the NFL is likewise a standard form of economic analysis. As set forth above, Dr. Rascher examined various aspects of both college football media rights and NFL media rights. Among other analyses, he examined demand for NFL teams' out-of-market games and demand for top-level college football games–the quintessential work of an economist. Through this yardstick analysis, Dr. Rascher found college football and the NFL to be comparable in economically significant and meaningful respects. To the extent differences were presented, his analysis found them economically insignificant.

As a result, it is likely that in the but-for world, out-of-market NFL games would be televised (as the top college football games all are) on free over-the-air and standard cable/satellite channels. Dr. Rascher opined that consumers would face no additional costs beyond their existing cable or satellite bill to view NFL out-of-market games in the but-for world based on his economic analyses. This conclusion too was

---

[66] *See supra* n.5.

28

reinforced by standard, reliable economic analyses set out in Dr. Rascher's written reports. The difference between the amount Sunday Ticket purchasers paid and this no-additional-cost world represented damages. That calculation precisely follows the standard and reliable yardstick approach regularly employed by economists and endorsed by this Circuit.[67]

Dr. Rascher's analysis makes reasonable inferences and is not simply guesswork or speculation. Dr. Rascher admits that his but-for-world is not an exact replica of the college football world.[68] But the question is not whether there are any differences, but rather whether there is a "meaningful economic similarity"[69] and whether the differences can either be addressed or controlled for or otherwise determined to be economically insignificant. Dr. Rascher analyzed just that.

Based on Dr. Rascher's sound testimony, we agree that there are no differences between the NFL and college football that render it an inappropriate yardstick for purposes of estimating damages. College football is a useful analogue for determining whether the challenged

---

[67] *Image Tech.* 125 F.3d at 1222.

[68] Fundamentally, with multiple major conferences, some independent sellers, and more than 120 teams at the top level, college football is a much more competitive market on the sellers' side than the NFL. College football in total has many more teams and several distinct levels of competition all of which can be and are televised. Moreover, the college programs were already organized, doing business as individual entities and conferences prior to the *Board of Regents* verdict.

[69] *Image Tech.* 125 F.3d at 1222 (citations omitted).

29

conduct is anticompetitive and for estimating damages, and Dr. Rascher's methodology and use of college football is well-grounded in economic theory and practice.

## CONCLUSION

In summary, Dr. Rascher applied standard economic principles and methodologies to (1) analyze whether the challenged conduct suppressed output and increased price for out-of-market NFL television broadcasts, and (2) estimate damages after concluding that the challenged conduct did suppress output and increase price. Dr. Rascher identified markets for similar products (*e.g.,* college football telecasts in the United States and Sunday Ticket in Canada) and analyzed the economic significance of the similarities and differences of these markets to the market for out-of-market NFL games in the United States (in which Sunday Ticket is the sole seller). Opining that the these more competitive markets are meaningfully economically similar, Dr. Rascher then opined that the challenged conduct suppressed output and increased prices for out-of-market NFL games in the United States. Dr. Rascher then employed a standard technique to estimate damages.

Dr. Rascher's testimony should not have been excluded, and the signatories to this brief respectively urge this Court to reinstate it.

30

Respectfully submitted,

By: */s/ Patrick F. Madden*

PATRICK F. MADDEN
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3035 (*telephone*)
*pmadden@bm.net*

MATTHEW SUMMERS
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684 (*telephone*)
*msummers@bm.net*

*Counsel for Amicus Curiae*

31

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s) 24-3576**

I am the attorney or self-represented party.

**This brief contains 6,804 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: January 17, 2025

BERGER MONTAGUE PC

*/s/ Patrick F. Madden*
PATRICK F. MADDEN

*Counsel for Amicus Curiae*

## APPENDIX: LIST OF AMICI CURIAE[70]

*Nola Agha, University of San Francisco*

*Robert Baade, Lake Forrest College (Emeritus)*

*David Berri, Southern Utah University*

*Craig Depkin, University of North Carolina, Charlotte*

*Rodney Fort, University of Michigan*

*Jill Harris, Air Force Academy*

*Anthony Krautmann, DePaul University*

*Michael Leeds, Temple University*

*Joel Maxcy, Drexel University*

*Raymond Sauer, Clemson University, Emeritus*

*John J. Siegfried, Vanderbilt University*

*Hal J. Singer, University of Utah*

*John Solow, University of Central Florida*

*Stefan Szymanski, University of Michigan*

*Jason Winfree, University of Idaho*

*Andrew Zimbalist, Smith College*

---

[70] This brief presents the views of the individual signatories. Their institutional affiliations are listed for identification purposes only.